## AMERICAN BRAKE SHOE & FOUNDRY CO. et al. v. PITTSBURGH RYS. CO.

(District Court, W. D. Pennsylvania. May Term, 1918.)

### No. 201.

1. **Constitutional law ⬅=135—Contracts by public service corporations not inviolable.**

   Contracts made by public service corporations, because of the interest of the public therein, are not to be classed with those personal and private contracts, the impairment of which is forbidden by constitutional provisions, and such contracts are not inviolable where, directly or indirectly, they affect rates to be charged the public, which on the one hand may not be made unreasonably high and on the other must be such as to afford the owners of the property a fair return on its fair value.

2. **Public Service Commission ⬅=19½, New, vol. 12A Key-No. Series—Court will not order receivers to pay license taxes in advance of state commission's determination of validity.**

   In view of Pennsylvania Public Service Act of 1913, creating a state Public Service Commission (Pa. St. 1920, §§ 18057–18214), and which as construed by the courts of the state vests such commission with power over rates and rate contracts, whether made before or after its passage by a public service corporation, a federal court having possession by its receivers of an extensive street railway system serving a large number of municipalities, many of which, under ordinance contracts granting franchises, have imposed license taxes on the company, will not order its receivers to pay such taxes in advance of a determination by the Public Service Commission of their reasonableness and validity.

3. **Judgment ⬅=738—Not conclusive against public as to facts not controverted.**

   The judgment in an action which involved rights of the public will not be held to create an estoppel against the public as to a fact which was assumed because no evidence was offered in regard thereto.

In Equity. Suit by the American Brake Shoe & Foundry Company and others against the Pittsburgh Railways Company. On petition of City of McKeesport to require payment by receivers of franchise taxes. Denied.

⬅=For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Howard W. Douglass, of McKeesport, Pa., for city of McKeesport.

Chas. B. Prichard and Geo. N. Monro, Jr., both of Pittsburgh, Pa., for city of Pittsburgh.

Gordon & Smith, Geo. E. Alter, and Geo. C. Bradshaw, all of Pittsburgh, Pa., for receivers.

Reed, Smith, Shaw & Beal, of Pittsburgh, Pa., for Consolidated Traction Co. (Pittsburgh Railways Co.).

ORR, District Judge. It appears from the petition of the city of McKeesport that it embraces within its limits what was formerly the borough of Reynoldton; the latter being now the Tenth ward of the said city. It appears, also, that the Pittsburgh Railways Company, which is now in the hands of receivers appointed by this court, was, at the time of the appointment of said receivers, operating lines of railway formerly owned and operated by the Dravosburg, Reynoldton & McKeesport Passenger Railway Company and the McKeesport Passenger Railway Company, both of which corporations, by various mergers, agreements, consolidations, and sales, have become part of the system of the Pittsburgh Railways Company.

With respect to the first of said two passenger railway companies, the borough of Reynoldton granted to the former a franchise by ordinance, which, among other things, provided that no license tax for borough purposes should be levied on said company for said franchise until after the expiration of five years from the beginning of operations, but further provided as follows:

"After the expiration of said period of five years, said company shall pay into the borough treasury such sums as license as counsel may hereafter provide for."

With respect to the second of said passenger railway companies, the city of McKeesport, then the borough of McKeesport, passed an ordinance similar to that which is described as the ordinance of the borough of Reynoldton. The period of 5 years expressed in both of said ordinances was later extended to a period of 15 years.

After the said several companies had commenced operations, and after the expiration of the periods of 15 years, as mentioned in the said ordinances, the city of McKeesport passed two ordinances, one as successor of the borough of Reynoldton, levying a license fee of $2,000 per year, and the other as successor of the borough of McKeesport, levying a license fee of $8,000 per year, and provided for notice of such licenses to be given to the Pittsburgh Railways Company. In addition to the license fees fixed by the ordinances, there is a 10 per cent. penalty provided for in case of failure to pay the same, when due, under the terms of the ordinances.

The petition prays for an order directing the Pittsburgh Railways Company, and the receivers thereof, to pay certain of such license fees which are in default. The court cannot close its eyes upon the picture, so often presented in this case, of a largely extended street railway system, serving, as it does, various municipalities, perhaps exceeding 50 in number. Every one of said municipalities is more or less dependent upon said system for the reasonable accommodation

of its inhabitants; yet, so far as has come to our knowledge, there is not one of them which did not exact some annual tribute from the Pittsburgh Railways Company at the time receivers were appointed. Such exactions do not appear to have been based upon any uniformity with respect to municipal requirements or with relation to the amount of service rendered to the people within their respective limits or the rentals therefrom. They are apparently the result of contracts more or less found in municipal ordinances. The variations between the ordinances indicate a disregard of substantial considerations in some of the contracts, in all of which the public are interested. The situation illustrated by the foregoing observations grows out of a lack of consideration of the obligations and duties of those who own public service corporations.

[1] In every consideration of the relations between public service corporations and the public, it is necessary that certain fundamental principals be kept in mind. The public has an interest in every contract entered into by a public service corporation, whether it be a contract by writing and signed by both parties thereto, or a contract arising by reason of the passing of a municipal ordinance and its acceptance by the public service corporation intended to be affected thereby. Such contracts, because of the interest of the public therein, are not to be classed with those personal and private contracts, the impairment of which is forbidden by constitutional provisions. The public service corporation cannot charge undue and excessive rates, for such conduct would be oppressive to the public. On the other hand, the public cannot continue to use the instrumentalities of the private corporation without permitting to the owners thereof a fair return upon a fair value of such property (not dividends upon inflated capital or interest upon excessive bonded indebtedness), for such refusal would amount to confiscation. To avoid oppression on the one hand, and confiscation on the other, should be the mutual desire of the parties interested in such contracts. Where the relative duties are equally balanced, that is to say, when the desire of all parties may be realized in accordance with the foregoing suggestion, it is plain that all the obligations of a public service corporation are, and must naturally be, met by those of the public who are served by it.

[2] The foregoing principles are really fundamental, and are growing more and more generally accepted as such, as appears by various recent decisions of the courts. An interesting case is Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77. There will be found an elaboration of some of the principles involved, with references to the common law of England, as well as to that of many of the states. By the Public Service Act of 1913 (Pa. St. 1920, §§ 18057–18214), Pennsylvania gave legislative expression, in more or less concrete form, to the foregoing principles, and created a commission with broad powers, to determine questions of contracts to which public service corporations might be parties. Certain contracts previously deemed valid have been held to have become inoperative when the public service law went into effect on January 1, 1914. In V. & S. Bottle Co. v. Manufacturers' Gas Co., 261 Pa. 523, 104 Atl. 667, it was determined that an agree-

ment between a manufacturer and a gas company, fixing the rate at which the latter would furnish gas to the former, became inoperative at that date. In Leiper v. B. & O. R. R., 262 Pa. 328, 105 Atl. 551, the court refused to enforce, in equity, a contract relating to rates entered into prior to the passage of the Pennsylvania act.

In Borough of Wilkinsburg v. Public Service Commission, 72 Pa. Super. Ct. 423, it was squarely held that the franchise of a street railway company conferred in accordance with the provision of the Constitution, "that no street passenger railway shall be constructed within the limits of any city, borough or township without the consent of its local authorities" (Const. Pa. art. 17, § 9), does not remove the subjects contained therein from the domain of legislative action, and that the general law designed to affect all public service corporations of the state applies equally to companies operating under ordinances which regulate the rates, as a condition precedent to the consent of the municipality, or under franchises in which the rates are not so regulated. In that case, the question was whether or not a street railway company could increase its passenger fares in Wilkinsburg, notwithstanding the fact that the ordinance of the borough granting the right to the company to lay its tracks in the streets prescribed certain maximum rates to be charged.

It is not necessary to review the authorities at great length. They confirm the principle that such contracts as we are considering in this case are not inviolable. If the public who use the instrumentalities of the public service corporation must pay a fair return upon the fair value of the property of such corporation, it is plain that the users must pay enough for the service to meet all the necessary expenses of operating the utilities afforded by such corporation, as well as the fair return upon the fair value thereof. The car riders, therefore, are called upon to pay all the expenses of operating the street railway system, and as well to pay to the owners a fair return upon the fair value thereof. The amount to be paid by the car rider necessarily depends, therefore, to a considerable extent, upon the contractual obligations to be met by the Railways Company. Such contractual obligations seem to be matters for the consideration of the Public Service Commission of Pennsylvania in the first instance. In other words, it is for the Public Service Commission of Pennsylvania, in the first instance, to determine whether any contract which has a relation to the fare to be paid by passengers is a valid contract or not. If such obligations of the Railways Company require the passenger to pay an excessive fare, the Public Service Commission may take cognizance thereof, because that Commission was inaugurated to determine rates to be charged by public service corporations, as well as to prevent discrimination with regard thereto.

As we have noted above, there are many municipalities which are served by the Pittsburgh Railways Company. The car rider upon a portion of the system, who may never have been in McKeesport or Reynoldton, in theory, is required to pay some portion of his fare in order to meet the demands of the city of McKeesport, if the contracts in this case are valid. Again, the car rider in the city of McKeesport

must in theory pay a portion of his fare to meet the franchise tax and the street-cleaning bill annually charged against the Railways Company by the city of Pittsburgh. The lack of uniformity in standards by which these annual charges have been made and heretofore exacted must necessarily cause a discrimination between the car riders upon one portion of the railway system and the car riders upon some other part thereof.

It appears in some part of the record in this case that the city of McKeesport has an annual bill against the Pittsburgh Railways Company for street cleaning, and it has appeared, time and again, that the city of Pittsburgh has an annual claim against the Pittsburgh Railways Company for street cleaning to the amount of $87,-000, and that the city of Pittsburgh charges tolls upon its bridges for the transportation of the car rider. It is doubtful if, in either city, the cars, with the present motive power, make as much dirt as one huckster's wagon, and it appears, so far as the city of Pittsburgh is concerned, that no one pays any tolls on the bridges except the car rider. Those who ride in taxicabs, and indeed all others, pay nothing. As all these payments do increase the expenditures of the Pittsburgh Railways Company, they must, of necessity, have their effect upon the amount required to be paid by the car riders. The various questions, being matters which affect rates, surely ought to be matters within the cognizance, in the first instance, of the Public Service Commission of Pennsylvania. It is a matter of common knowledge that 5-ton automobile trucks pay nothing to the municipalities for the use of their streets, where as the car riders must pay for the passage of cars over tracks built expressly for their use.

The foregoing are but a few of the many observations which might be expressed to show the lengths to which the various municipalities have gone in their treatment of the street railway corporation. We have not overlooked the fact that there are police powers vested in municipalities, but we have in mind the distinction which is to be drawn between the powers of a municipality when acting in its governmental capacity—i. e., police powers—and those which belong to it in its proprietary or quasi private capacity. Los Angeles v. Los Angeles Gas Corp., 251 U. S. 32, 40 Sup. Ct. 76, 64 L. Ed. 121. Again, we necessarily recognize that the question whether a municipal ordinance is within the power conferred by the Legislature upon the municipality is one of state law. Atlantic Coast Line v. Goldsboro, 232 U. S. 548, 34 Sup. Ct. 364, 58 L. Ed. 721.

We have wandered far afield in making many of the observations hereinabove set forth, but have done so because of the great importance of the questions suggested and the great need for securing the proper co-operation between the various municipalities and the system of railways in the hands of the court. To return, however, to the path pointed out by the petitioner in this case, we must consider the proposition, raised by it, that because of previous litigation the right of the petitioner to recover the franchise taxes imposed by the ordinances has been judicially determined.

[3] Counsel for petitioner relies upon the case of City of McKeesport v. Pittsburgh Railways Co., as reported in 252 Pa. 142, 97 Atl. 184. It is true that the said ordinances were before the court in that litigation, but it is also true that the reasonableness of the charges by the municipality was not determined. It is expressly stated in the opinion of the court below, which was adopted by the Supreme Court, that the reasonableness, of the charges were assumed because no testimony was offered with respect thereto. That being the case, there was no determination of the really important question which is before this court. Moreover, the litigation resulting in the judgment of that court was begun in 1911, long before the Public Service Commission of Pennsylvania was created. By the creation of the Public Service Commission a new factor was brought into existence, intended by the Legislature to have its part in prescribing the relations between public service corporations and municipalities. Further, the doctrine of estoppel by res adjudicata is much impaired by changed conditions, by lapse of time, and especially where the parties litigant are a municipality and a public service corporation. The rights of the public with respect to matters in controversy may be properly adjudicated, and yet, years later (in the present instance there has been a lapse of nine years), the conditions may have so changed that the public would suffer if the doctrine of res adjudicata would control their rights. The doctrine of res adjudicata appears to have grown up because of the fact that it was to the interest of the state that questions once decided should be forever removed from litigation for the peace and repose of society, but to enforce the rule upon unsubstantial grounds would work injustice. Vicksburg v. Henson, 231 U. S. 260, 34 Sup. Ct. 95, 58 L. Ed. 209. Where there are no purely private litigants, surely the public ought not to be estopped by any judgment or decree as to a fact which was assumed because no evidence was offered in regard thereto.

This court must refuse the petition of the borough of McKeesport, because it does not appear that the contract upon which it relies is a valid contract. This conclusion should not be accepted as a decision by the court that the contract is invalid, but as a statement that the validity of the contract has not been shown to the satisfaction of the court. Before this court will recognize any obligation on the part of the Pittsburgh Railways Company, or the receivers, to pay the sums sought to be recovered by the petitioner, the question of the validity of the contract must be determined in the first instance by the Public Service Commission of the state of Pennsylvania. If the Public Service Commission shall determine that the contract relied upon by the petitioner is valid, then the petitioner may renew its application to this court for the payment of such sums as may be proper.