58 F.Supp. 275 (1944)
UNITED STATES
v.
NOVERO.
No. 24312.
District Court, E. D. Missouri, E. D.
December 12, 1944.
*276 Harry C. Blanton, U. S. Dist. Atty., of Sikeston, Mo., for plaintiff.
John L. Sullivan, of St. Louis, Mo., for defendant.
DUNCAN, District Judge.
This is a motion to suppress evidence obtained by the agents of the Alcohol Tax Unit as the result of a search of the premises of defendant without a search warrant.
Charles Novero was indicted by the grand jury in the Eastern District of Missouri on September 15, 1944, under Section 3173 (b) (2), 26 U.S.C.A. I. R. C.; Section 2803 (a) (g), Title 26 U.S.C.A. I. R. C.; Section 3321 (a), Title 26 U.S.C.A. I. R. C.
The defendant operates a tavern at or near 1900 South Kingshighway Boulevard in the City of St. Louis. For some time prior to his arrest, the agents of the Alcohol Tax Unit suspected that Novero had not made return of all liquor owned by him and on hand on April 1, 1944, for the purpose of floor stock tax. Their investigations prior to his arrest indicated that he had purchased considerable quantities of liquor in excess of the amount sold in his tavern and accounted for in his return.
On several occasions they checked his tavern and the rooms above the tavern which were occupied as living quarters, but failed to discover the suspected shortage. The agents were taken by the defendant into a room over the tavern in which there was a bed and other bedroom furniture and items of wearing apparel, and the agent was advised by defendant that it was his room and that he lived there. According to the testimony of the agent, in response to a question propounded to Novero, *277 he stated that he had no other room and owned no other property.
After the investigation at the tavern, one of the agents testified that he obtained information that Novero owned a tract of 7¾ acres of land near Pond in St. Louis County, a short distance from the City of St. Louis. Defendant testified that he acquired the land approximately two years prior to the time of his indictment. The buildings on the land consisted of a barn, smokehouse, a garage and a four room dwelling house. The dwelling house and the smokehouse were surrounded by a fence.
Following the purchase of the property, Novero modernized the dwelling house. He installed electric lights, furnace, hot and cold running water and a sewer system and completely furnished the four rooms, including an electric refrigerator. In other words, the house was completely modernized by Novero. There was some livestock, comprising nine calves, ten hogs and a mule on the place.
The house, furnished, was occupied for some time by a person employed by Novero. He took care of the property, fed the stock and did other things about the place. Prior to the search, he left the employ of Novero and moved out of the house. At the time of the search, the place was not occupied.
As the owner of the tavern at 1900 South Kingshighway, defendant had a general liquor license for that address. There is no evidence tending to show how long he had been in business there, or how long he had occupied the room above the tavern. He was registered as a voter in the City of St. Louis from the Kingshighway Boulevard address. Novero testified that the house in which the liquor was found at Pond was his home, that he slept there on week ends, and some times during the week he went out there and stayed, that some of his clothes were there and that he considered the property his home.
One of the agents testified that during the investigation he learned through a source which he stated he would rather not reveal, that Novero had some liquor stored at the Pond property. Acting on that information, two of the agents drove to the Pond property and found the house unoccupied. A painter in the employ of Novero was working around the place, and, according to the testimony of the agent, the back door of the house was unlocked and the door standing open. The agent inquired of the painter as to who lived there and was advised that no one lived there.
"Q. * * * `Is there a caretaker?' And he said, `No; he quit sometime before.'
And I said, `Who owns the place?' And he told me Charley Novero. I said, `You have no objection to me going in?' He said, `I haven't any right to object, it doesn't belong to me.' And the house was unlocked."
The agents went into the house without a search warrant and, by means of a penknife, one of them picked a lock on a door leading into the basement. A search there revealed nothing. They then picked another lock on a door leading to an upstairs room. There they found approximately one hundred fifty cases of whisky and wine and a few cases of groceries.
Thereupon the agent called the office of the Alcohol Tax Unit in St. Louis and reported what had been found and requested that another agent go by the Novero tavern and bring Novero out to where they were. In response to that call the agent went to the Novero tavern, identified himself, and informed Novero what the other agents had found and took him to the farm.
Upon his arrival at the farm and having been further apprized of what had taken place, the agents requested Novero to unlock the buildings outside of the house, that is, the smokehouse and the garage, and he complied. In the smokehouse they found a quantity of tax-paid wine. They then directed his attention to the garage, which was outside the yard 100 or 150 feet away and inquired what was in it. The agent testified that: "Just as we started out, I said `What is in that building Charley?' (referring to the garage). He said `Some moonshine in there.'"
At the request of the officers Novero unlocked the garage and in it they found three fifty gallon barrels of non-tax paid liquor (moonshine), a quantity of wine, several glass jugs of alcohol and other jugs and bottles and 75 cases of tax paid liquor. Novero denied that he stated to the agent that there was moonshine whiskey in the garage, and denied ownership thereof, but admitted ownership of the 75 cases of whiskey and other tax paid liquor. An inventory of the liquor was made and it was removed and stored by the agents. Novero was brought back to the city and admitted to bail. Later he was indicted and this motion is filed as a result thereof.
*278 The agent testified with respect to the house, that the house was nicely furnished as a dwelling house, and included living room, bedroom, kitchen and dining room. It was equipped with furnace, electric lights etc.
Defendant contends that it was his dwelling house and protected against unlawful search under the provisions of the Fourth Amendment to the Constitution of the United States. On the contrary, the Government insists that the defendant's residence was at the 1900 South Kingshighway Boulevard address, where he admitted having a room, and from which he was duly registered for voting purposes in the City of St. Louis, and that the residence located on the Pond property was not his residence and dwelling house, and that the evidence obtained by the agents in a search thereof without a warrant may be used against him in a criminal prosecution.
Unquestionably, if the property was the residence of the defendant, then of course the agents had no right to search it without a search warrant, and the evidence obtained as a result of such search was improperly obtained and should be suppressed.
The Fourth Amendment[1] protects all, those suspected or known to be offenders as well as the innocent, and the duty of giving it force and effect is obligatory upon all entrusted under our Federal system with the enforcement of the law. Go-Bart Importing Co., v. United States, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374; Weeks v. United States, 232 U.S. 383, 392, 34 S.Ct. 341, 58 L.Ed. 652, L.R.A.1915B, 834, Ann.Cas. 1915C, 1177.
Therefore, it is first necessary to determine whether or not the house in which the search and seizure was made was the residence or the dwelling house of the defendant. The provisions of the Fourth Amendment[1] should be liberally construed in favor of the individual. Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524; Sgro v. United States, 287 U.S. 206 loc.cit. 210, 53 S.Ct. 138, 77 L.Ed. 260, 85 A.L.R. 108.
Defendant, a single man, had acquired the property upon which was located the dwelling house in which the seizure occurred, about two years before his indictment. He testified that it was his home. He had apparently expended considerable sums of money in modernizing the place by putting in electric lights, a sewer, hot and cold running water, a furnace and completely furnishing the four rooms, including a Frigidaire. It is the undisputed testimony that he went there to stay and sleep over week ends and occasionally during the week; that was true even while the property was being occupied by an employe of defendant.
He had also acquired and placed thereon some livestock, as heretofore stated. Every act done with respect to the property was indicative of an intention to make it a home. Residence being a question of intention, even though a person may spend most of his time elsewhere, the place to which he expects to return is considered his home. As was said in United States ex rel. Devenuto v. Curran, 2 Cir., 299 F. 206, loc.cit. 211: "Residence denotes a place of abode, without regard to whether it be temporary or permanent, while a domicile is the place where the law regards the person to be, whether or not he is corporeally found there. And one may have several residences at the same time but he can only have one domicile at a time."
We are living in a highly transitory age. It certainly isn't uncommon for persons now to have more than one place which they may rightfully call "home". The place a man considers his home will be afforded the protection of the Amendment, although he may spend a part, even the greater part, of his time at some other place.
The testimony of the agent and of the defendant himself indicate that the room over the tavern was a rather meagerly furnished affair with a bed and other necessary articles of furniture, including clothing belonging to the defendant. There were no closets in any of the rooms above the tavern. In view of the circumstances in connection with the acquisition, the development and the modernizing of the Pond property, the belief may be justified that it was the intention of the defendant to occupy it as a home, and that in fact it was his home. That being the fact, it was *279 unlawful for the agents to search the house without a search warrant, except as an incident to a lawful arrest. United States v. Lee, 83 F.2d 195.
The agents had no search warrant, and, according to the agent's own testimony, they did not possess sufficient evidence upon which to obtain a search warrant. At the hearing the agent testified:
"Q. Why did you go out there? A. To look for this liquor.
"Q. You wanted, if possible, to find liquor some place that he failed to report? A. That he failed to report.
"Q. That he failed to report, and that is why you went out there? A. Yes, sir.
"Q. Did you have a search warrant? A. No. sir.
"Q. Why didn't you get a search warrant, Mr. Gill? A. Well, I didn't know that I had enough evidence for a search warrant. It was based on probable cause. I didn't think I had enough evidence for a search warrant. I didn't think I needed one anyway. And I couldn't have gotten it if I wanted it on the evidence I had.
"Q. You have been with the Alcohol Tax Unit for many years? A. Since they started.
"Q. During the old days? A. Yes, sir.
"Q. And based on your experience, you know something of the evidence which is needed to support the issuance of a search warrant? A. Yes, sir.
"Q. And you had to determine probable cause? A. Yes, sir.
"Q. And knowing that which amounts to probable cause, it was your judgment you were not in possession of sufficient facts or information to support a condition of probable cause? Is that right? A. For a search warrant, that is not.
"Q. And that being your condition of mind, you went out and searched the premises in order to determine whether you could find any record there, did you not? A. That is right.
"Q. That is why you went out there? A. Yes, sir."
There was no arrest of the defendant until after the search of the dwelling. In view of these findings, the conclusion must follow that the search without warrant was unlawful, and that the evidence obtained as a result thereof cannot be used to secure defendant's conviction. United States v. Slusser, D.C., 270 F. 818; Boyd v. United States, 116 U.S. 616, 634, 6 S.Ct. 524, 29 L.Ed. 746.
Defendant contends that the buildings, particularly the garage in which was found the non-tax paid liquor and 75 cases, approximately, of tax paid liquor, were a part of the curtilage and therefore was entitled to the same protection as the dwelling house under the Constitution. The undisputed testimony is that there was a fence around the dwelling house and certain other small buildings, probably a smoke house, and that the garage was located outside of this fence, about 100 to 150 feet from the house. It was in no way connected with the dwelling house and not a part of it. Therefore, I do not deem it necessary to determine whether or not the garage was a part of the curtilage. It was at least within reasonable close proximity to the dwelling house, and it certainly came within that category of buildings and houses on one's property which require a search warrant for the search thereof in the absence of probable cause.
Therefore, let us determine whether or not the agents had probable cause to search the garage. Evidence upon which an officer may base probable cause for search without a warrant must be sufficient to obtain a search warrantand evidence which would be competent in the trial of the offense before a jury. There is no such evidence to be found in this case. The court in Grau v. United States, 287 U.S. 124, loc.cit. 128, 53 S.Ct. 38, loc.cit. 40, 77 L.Ed. 212, stated: "A search warrant may issue only upon evidence which would be competent in the trial of the offense before a jury." (Citing cases). The agent testified that he did not have a search warrant, and that he did not have sufficient evidence upon which to obtain a search warrant. The agent had no definite knowledge that liquor was being stored on the premises. He did testify that he had information that there was liquor stored there, but there was no evidence as to the basis of that information, and his testimony on cross examination clearly showed that the visit to the farm was an exploring expedition, hoping it would be productive of results. Before he searched the garage, he had already searched the dwelling house and had discovered liquor stored there. He could not rely upon that discovery as evidence upon which to base probable cause for the search of the garageat least without a search warrant. As stated in United *280 States v. Slusser, D.C., 270 F. 818, loc.cit. 819:
"An unlawful search cannot be justified by what is found. A search that is unlawful when it begins is not made lawful when it ends by the discovery and seizure of liquor. It was against such prying, on the chance of discovery, that the constitutional amendment was intended to protect the people.
"Neither is the discretion of the officer, however good and well-intentioned, a substitute in law for a search warrant issued by a proper magistrate. It is to the latter that the law has committed the discretion to say when a warrant shall issue; and it can only issue on probable cause, supported by oath or affirmation, particularly describing the place to be searched and the persons or things to be seized."
Unlike the dewlling, the agent had a right to search the garage without a warrant, if upon probable cause and without malice, Schnorenberg v. United States, 7 Cir., 23 F.2d 38.
The conduct of the agent at the farm did did not indicate that he had any knowledge or information whatsoever that liquor was stored in the garage or other outbuildings, because he immediately went into the house to make his search. Apparently he had no more than casually observed the outbuildings and had made no investigation or inspection as to what they might contain, nor had he determined upon a search of them prior to the arrival of the defendant in the custody of another agent. In this respect the agent testified:
"Q. And did you ask him to open up the other places where you couldn't pick the lock? A. I didn't try to pick them. I knew I couldn't. They were very heavy padlocks. After finding this liquor in this one place, I was counting on taking an inventory and marking it seized and everything.
"Q. Did you have him brought out in the belief he might have keys and would open the place? A. To show him what we found and let him know we were seizing it. I hadn't thought about him opening the other places until he got out there. I noticed they were locked; I had rather the man who owns the property to be there when I seize it. He might make some statement, too, about it."
Certainly if the agent had a right, as he contended, to search without a warrant, he had a right to do so before the arrival of the defendant in custody. The actions of the agent on the premises were not those of a person possessed of substantial information about any particular thing. At most he was guided by a suspicion and a hope, which could not constitute probable cause for searching the garage without a warrant, and it is the court's conclusion that the search of the garage and other buildings was without probable cause, and was unlawful, unless the defendant acquiesced therein by his actions in unlocking the buildings.
The Government contends that, even assuming the agents had no right to search the garage without a search warrant, the defendant waived his constitutional right to complain of such search and of the use of the evidence obtained as a result thereof in a criminal prosecution against him because he unlocked the garage in response to the agent's request.
The defendant testified that the agent came by his place, identified himself by exhibiting his credentials, told him what had occurred, and requested him to accompany the agent to the farm. There was some suggestion that defendant inquired whether or not he was under arrest and that he be given an opportunity to secure bond. Whereupon the agent informed him that that would come later. At any rate, he accompanied the agent in the agent's car to the place of the seizure, as he was requested to do.
Upon defendant's arrival at the farm, and after having been informed more fully of what had taken place, one of the agents inquired as to what was in the garage. The agent states that defendant's reply was "moonshine liquor". This the defendant denies. Whatever the fact may be, the agent requested the defendant to unlock the smokehouse and the garage. The agent testified:
"Q. Then you say you called St. Louis? A. Yes, sir.
"Q. And had an officer pick Charley Novero up and bring him out? A. That is right.
"Q. And while out there, you say you took him to the smokehouse and asked him to open the smokehouse? A. That is right.
"Q. And he did that? A. That is right.
"Q. And you then took him to the garage? A. I told him I wanted to go to the garage and see what was in there, and *281 he went with me and unlocked the door. "Q. You asked him to unlock it? A. Yes, sir.
"Q. And he unlocked it? A. That is right."
On the contrary, the defendant contends that he was under arrest at the time of the unlocking of the building, and that whatever he did was in response to the command of the officers, in whose custody he was at the time.
If the Government's contention is correct and the defendant voluntarily unlocked the outbuildings for the purpose of permitting a search, he did waive the protection afforded him by the Constitution and the evidence found would be competent on a trial against him for its unlawful possession. Where one in custody peacefully submits to the demands of an officer for the unlocking of premises, it is not a waiver of his constitutional rights. United States v. Slusser, D.C., 270 F. 816, 819.
As to whether or not the defendant was under arrest, it should be remembered that he was in the custody of three officers and had been brought to the premises pursuant to the orders of one of those officers in the custody of another. In respect of that the agent testified:
"Q. Can you tell us, please, whether or not in your judgment, Charley Novero was under arrest when he was brought out to his place? A. I can't answer that question, I didn't pick him up. I didn't tell him to arrest him. I told him to stop him and bring him out.
"Q. Well the stopping and picking up was at your order? A. Yes, sir."
As the search of the smokehouse and garage was without probable cause, and as defendant did not waive his constitutional rights by peacefully complying with the orders of the officers in whose custody he was, to unlock the buildings, the evidence obtained as a result of the search cannot be used to secure his conviction. The agent requested him to unlock the buildings and he complied with the request. In so doing, he did not waive any rights which were afforded him under the Constitution.
In his motion defendant requests that the seized liquor be returned to him. The Government insists that Section 2912, Title 26 U.S.C.A., I.R.C., "All distilled spirits found elsewhere than in a distillery or internal revenue bonded warehouse, not having been removed therefrom according to law, shall be forfeited to the United States," prohibits the return of the liquor. It also contends that under Section 2854, Title 26 U.S.C.A., I.R.C., the burden is placed on the defendant to show that the requirements of the law have been complied with.
So far as this proceeding is concerned, neither of these sections is applicable. Certainly there is no charge in the indictment and no suggestion from any other source that the tax paid liquor was not properly removed from a distillery or warehouse. If the court were to hold in accordance with the contention of the Government, the finding of the court that the search and seizure were unlawful would be completely nullified. What the Government may see fit to do in the future with respect to the forfeiture of the liquor is not now a matter for consideration by this court.
Defendant's motion is sustained and all of the liquor seized as a result of the searches, except the nontax paid liquor, is hereby ordered to be returned to the defendant.
The defendant denies ownership of the non-tax paid liquor. The non-tax paid liquor stands before the court unclaimed and without a defender. Its existence from the beginning was illegal and in it there can be no property rights. When those who deal in it are caught, they are quick to deny their association with it. Having no right to exist, its present keeper may destroy it as the law directs.
NOTES
[1] "The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated, and no Warrants shall issue but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized."