THE STATE OF WASHINGTON, *Respondent*, v. JOHN KINNEAR, *Appellant*.[1]

*Revelle, Simon & Coles,* for appellant.

*Charles R. Denney* and *F. W. Mansfield,* for respondent.

BEELER, J.—The defendant was charged by information with the crime of being a bootlegger. He seasonably moved to suppress as evidence the intoxicating liquor seized by the officers at the time of the arrest, on the ground that the search and seizure were with-

[1]Reported in 298 Pac. 449.

out a warrant and without probable cause, in violation of the Fourth and Fifth Amendments to the Federal Constitution, and § 7, Article I of the state constitution. The motion being denied, the cause was called for trial, and, at the conclusion of the prosecuting attorney's opening statement to the jury as to what he intended to prove, the court ruled the statement was insufficient to sustain the charge of bootlegging, and thereupon the trial proceeded merely on the included offense of possession.

At the close of the state's case, the defendant challenged the legal sufficiency of the evidence and moved for a directed verdict, which was denied. The defendant, relying on his motion to suppress, offered no testimony in his own behalf. He was found guilty and sentenced to pay a fine of $150 and serve sixty days in the common jail. The defendant has appealed.

The only question presented for our consideration is the legality of the search and seizure, which was made without a warrant. The facts and circumstances surrounding the search and seizure may be briefly narrated: Two deputy sheriffs, Johnson and Clark, on numerous occasions prior to September 20, 1929, had received reports that liquor and narcotics were being smuggled and carried by airplane and landed at the Everett Airport, and, although they had spent many hours watching planes, they had never previously apprehended anyone. The officers had never heard of appellant; they never had him under surveillance, nor suspected him of dealing in nor handling liquor or narcotics.

At about 4:15 p. m., September 20, 1929, the officers, while on the streets of the city of Everett, noticed what they were pleased to term "a strange looking plane," circling over the city and thence to the airport, and thereupon they repaired to the port and watched the

defendant as he landed and stepped from his plane, at which time officer Clerk "noticed some cow dung on the plane, indicating that the plane had landed in some out-of-the-way place." The officers then accompanied appellant to the airport office, where he registered and telephoned to the Renton Airport, distant some thirty miles, which Clark testified he had heard mentioned in connection with liquor activities; that about this time one Scott, reputed to be a liquor dealer, and who had been arrested in Canada with a load of whiskey on his own airplane, and who had previously been manager of the airport, arrived, and, according to the testimony of officer Johnson,

" . . . looked surprised and did not talk to Kinnear nor go near the plane, and Scott's actions were very peculiar, and Scott's peculiar actions and previous reports which affiant had heard regarding Scott made affiant *suspicious* that something was wrong."

While at the office of the airport, some individual, whose identity is undisclosed, came in and spoke to officer Clark, whom he knew to be a deputy sheriff, saying: "There is something in that ship;" that both officers remained in the airport office for about twenty to twenty-five minutes carrying on a general conversation with appellant, and at the conclusion Clark and appellant left, the latter going to a nearby highway, and Clark, who waited until appellant was out of sight, went to the plane, unfastened and removed the canvas or cover from the front cockpit and discovered the liquor, split open a sack, extracted a bottle, and returned and reported the matter to officer Johnson, and thereupon appellant was placed under arrest. On cross-examination, the deputy sheriff, Clark, in part testified:

"By Mr. Coles: Q. Mr. Clark, at the time you went to the airport in the afternoon of September 20th, had

you had any prior information as to this particular aeroplane in question? A. No, sir. Q. Did you have any prior information as to the defendant, John Kinnear? A. No, sir. Q. Had you ever heard of him before you arrested him? A. No, sir. Q. When his aeroplane was landed were you in a position where you could see the front cockpit of this aeroplane? A. No. Q. After the plane was taxied up to the hangar did you see this front cockpit covered by a canvas snapped down? A. Yes, sir. Q. Was it impossible for you to see into the front cockpit? A. Yes, sir. Q. You could not see into the front cockpit? A. No, sir. Q. Before you went up to search this aeroplane did you have any reason to believe, based upon any evidence whatsoever, that this defendant or this aeroplane was violating the law?

"By Mr. Denney: I object to that as calling for the conclusion of the witness.

"By Mr. Coles: We are inquiring into his state of mind at the time he made this search.

"By the Court: Of course, your question is whether he had reason to believe. You can ask him what he knew.

"Q. Did you know anything about what this plane contained at the time you searched it? A. No, sir. Q. Did you know what you were going to find in this plane when you searched it? A. No, sir. Q. You then went up and searched this front cockpit? A. Yes, I did. Q. And for the first time you were able to see into the cockpit and saw the sacks? A. Yes, sir. Q. And you then split one of the sacks open and you found it contained liquor? A. Yes, sir. Q. And up to that time you did not know that this defendant or his aeroplane was in any way violating the law? A. No, sir. Q. Now, Mr. Clark, I would like to have you tell the court how this front cockpit was covered and how you uncovered it? A. Well, it was an ordinary cockpit on a plane and had—I don't know, but it is kind of black canvas or oilcloth, or more like the top of an automobile—that kind of material—and on the sides are little snaps and—the same as putting curtains on cars—and there are recesses for those snaps to go

around and close it up and that is all I can tell you about it.''

So the question is: Did the officers have reasonable cause to believe that intoxicating liquor was concealed in the airplane, so as to justify them in making the search and seizure without a warrant?

The officers, by their sworn statements, admit they neither had nor gained any knowledge concerning the presence of liquor in the plane by their own senses, either by the sense of smell or the sense of sight. The liquor was concealed in the forward cockpit covered with a black curtain, something akin to an automobile curtain, and securely fastened. The sacks or containers were completely concealed. Since the officers admit they had no personal knowledge of the presence of liquor before they searched the plane, the question becomes narrowed: Did the officers have reasonable cause to believe that liquor was in the plane from the information conveyed to them by others, and from what they observed while at the airport?

It is essential to note at the outset that the only information received by Johnson before going to the airport, as disclosed by his affidavit, was limited to reports that the Everett Airport was used by liquor and narcotic smugglers as a place to land their planes. On the other hand, Clark, in addition to his affidavit, was called as a witness at the time of the hearing on the motion to suppress. He was carefully examined by both parties. It was Clark who saw the ''foreign litter'' on the plane, and who heard the Renton Airport mentioned in connection with liquor activities. The statements ''there is something in that ship,'' and ''something interesting is going to happen at the airport'' were made to Clark. Johnson nowhere in his affidavit states that he observed the litter or heard these statements. It is especially essential to note that

Clark alone made the search and seizure unaided and unassisted by Johnson.

Furthermore, the officers had received no information from any source that appellant contemplated landing his plane on the afternoon of September 20, or at any other time. In the very nature of things they could have received no such information, because appellant was compelled to make a forced landing, being caught in a severe electrical storm. True, officer Clark swore that, on the day previous, he had received information "that something interesting was going to happen at the Everett Airport." But his affidavit fails to show what was expected to happen, how it was to happen, or *when* it was to happen. It is likewise true that both officers swore that they had received numerous reports that liquor and narcotics were being landed at the airport, yet it would seem that this information was materially nullified by their own admissions— that, although they had spent many hours watching planes, they had never apprehended anyone. The record is silent whether this watching extended over days, weeks or months.

It is very significant that the officers, as they arrived at the airport and saw appellant step from his plane on which one of the officers claims he saw "foreign litter," failed to place appellant under arrest, if they believed a felony was being committed. It is very significant that the officers during the twenty or twenty-five minutes while engaged in a general conversation with appellant at the airport office, and during which time some unidentified individual stated to Clark, "there is something in that ship," failed to place appellant under arrest at that time, if they believed he had committed a felony. After this conversation concluded, the officers separated, Clark and appellant left the airport office, and Johnson apparently remained

there keeping watch on Scott. Appellant was permitted to go unaccompanied and unguarded to a nearby highway, and Clark, feeling sure he was not being observed by appellant, went to the plane alone.

Therefore, it is important to inquire as to Clark's state of mind immediately prior to and at the time of the search, as to whether he had reasonable and probable cause to believe liquor was concealed in the plane. He admits he had no prior information concerning the appellant; admits he had never heard of him previously; admits he could not see into the cockpit; admits it was a common practice to have the front cockpit of an airplane covered, "particularly when it is raining"; admits Scott did not "wave his hand" at Kinnear "nor did he do anything else that looked suspicious." But his real state of mind is disclosed on redirect examination:

"By Mr. Denney: Q. Did you believe from the things you had seen there and the conversation with this man that there was liquor in the plane or something unlawful was being carried on? A. *I don't know just what I did believe about it, to be honest and truthful with you.*"

No magistrate would be justified to issue a warrant under such circumstances. Probable cause must be shown before a warrant will issue. Under the facts here established, probable cause was not shown. The law requires reasonable and probable cause on the part of officers to justify them in making a search without a warrant.

In the case of *Brown v. United States,* 4 Fed. (2d) 246, the Ninth Circuit Court of Appeals had under consideration the legality of a search and seizure without a warrant. The circumstances were far more suspicious than the circumstances in the case before us.

There the arresting officer had received information that a certain individual who operated an automobile was a bootlegger. The license number of his car had been given to the officer. The officer on a previous occasion had observed the defendant deliver a package, indicating by its form it contained bottles. Later, the officer saw him park a car bearing this license number and remove a package as though it might contain bottles and walk up the street with it. The defendant was placed under arrest, tried, and convicted. An appeal was taken and the court, passing on the validity of the search, said:

" 'If the seizure is merely based upon a suspicion, and the facts are not sufficient to justify an arrest, the subsequent discovery by an examination of the evidence, secured by the seizure, that the suspicion was in fact well founded, is not sufficient to make what was unlawful at its commencement a lawful search. . . . The proper test, supported by the great weight of authority, by which this case should be decided, is: Were the circumstances presented to the officers through the testimony of their senses sufficient to justify them in a good-faith belief that plaintiff in error was in their presence transporting liquor in violation of law, or that he had in their presence liquor in his possession in violation of law? In other words, was there probable cause for them to so believe, or were the facts sufficient to give rise merely to a suspicion thereof? If the former the arrest was legal and the evidence secured by it admissible. If the latter, the arrest was illegal, and the evidence obtained not admissible.' *Garske v. United States*, 1 F. (2d) 620, 625.

"If, instead of arresting the plaintiff in error, the officer had presented all of the facts within his knowledge and all the information at hand to a magistrate, no magistrate would issue a warrant of arrest for the plaintiff in error; no magistrate would hold the plaintiff in error to answer for a crime before another tribunal; no grand jury would indict; no court would

submit the case to a jury; and, if the officer were sued for false imprisonment, no court would instruct that the arrest was justified, assuming all the foregoing testimony to be true. If we are correct in these conclusions, and we see no escape from them, the arrest was without authority of law, and the property wrongfully seized was not admissible in evidence."

See, also, *State v. Knudsen,* 154 Wash. 87, 280 Pac. 922; *State v. Gibbons,* 118 Wash. 171, 203 Pac. 390; *State v. Dersiy,* 121 Wash. 455, 209 Pac. 837; *State v. Smathers,* 121 Wash. 472, 209 Pac. 839; *State v. Buckley,* 145 Wash. 87, 258 Pac. 1030; *Emite v. United States,* 15 Fed. (2d) 623.

On the other hand, respondent contends that the officers had reasonable ground or probable cause to make the search, and rely on numerous authorities: *Lafazia v. United States,* 4 Fed. (2d) 817; *Reyff v. United States,* 2 Fed. (2d) 39; *Altshuler v. United States,* 3 Fed. (2d) 791; *King v. United States,* 1 Fed. (2d) 931; *Husty v. United States,* 51 Sup. Ct. 240, U. S. Adv. Ops. 1930-31, p. 294; *Ryan v. United States,* 5 Fed. (2d) 667; *Mattus v. United States,* 11 Fed. (2d) 503; *Betz v. Wynne,* 21 Fed. (2d) 119; *Bell v. United States,* 285 Fed. 145; *Carroll v. United States,* 267 U. S. 132, 69 L. Ed. 543; *Ash v. United States,* 299 Fed. 277; *Ungerleider v. United States,* 5 Fed. (2d) 604; *Lytle v. United States,* 5 Fed. (2d) 622.

In the *Lafazia* case, *supra,* the Federal prohibition director had received information that a boat load of liquor was to land on the western coast of Rhode Island at some place between two given points, and thereupon the director dispatched two of his agents to the vicinity, and late at night the officers observed a truck approaching, turned, and followed it, and the headlights of their car enabled them to see "cases in

which intoxicating liquor is usually packed through the latticed sides of the truck.'' They passed the truck, stopped it, and one of the men on the truck admitted they had a load of liquor. Thereupon, the seizure and arrest were made. The knowledge acquired by the officers by the sense of sight, and the admissions made by one of the defendants, was held to be sufficient to justify the officers to search without a warrant.

In the *Reyff* case, *supra,* prohibition agents gave one hundred dollars in bills to one Kettle, an informer, with which to purchase liquor from the defendants and have it delivered to a certain garage. The informer purchased the liquor, paid the money, and directed the defendants to deliver it at the garage. In the meantime, the officers had concealed themselves in the garage, and as the agent and informer drove in, the latter informed the officers that the liquor was in the car. It appears that one of the defendants, on being placed under arrest, dropped the money on the garage floor. There the officers had positive information at the time they searched the car.

In the *Altshuler* case, *supra,* the defendant had previously pleaded guilty to the charge of transporting liquor, and shortly thereafter the officers learned that he was continuing in the unlawful transportation of liquor, and directed a representative to call the defendant by telephone, who placed an order for twenty gallons of alcohol. The officers overheard this conversation and the arrangements for delivery. They knew the license number of the automobile, and as the car appeared at the appointed time and place, the officers searched the car and arrested the defendant. Here again the officers had positive knowledge.

In the *King* case, *supra,* the Federal officers had ''reliable and positive information that King was engaged

in the transportation of smoking opium and other narcotics,'' and the officers knew that a certain boat had arrived in the morning and had reason to believe that the defendant was to receive a shipment of opium. The officers concealed themselves at a point where the defendant would pass on his return to Seattle, and as the defendant's automobile approached with all the curtains drawn, the officers stopped the driver, searched the car, and found smoking opium. Not only are the facts in the instant case dissimilar to the facts in the *King* case, *supra,* which case was relied on by the district court in the libel proceedings for the condemnation and forfeiture of appellant's airplane, being the case of *United States v. One OX-5 American Eagle Airplane,* 38 Fed. (2d) 106, but the facts before the Federal court in the libel proceedings were limited apparently to the two affidavits of the officers, whereas on the hearing to suppress before the lower court, in addition to the affidavits of the officers, officer Clark testified in open court, which testimony very materially weakened the deductions to be drawn from the averments contained in the two affidavits. Furthermore, in the opinion in the case of *United States v. One OX-5 American Eagle Airplane, supra,* the court said:

"No representative of the United States participated in the search. Hence, the Fourth Amendment has no application."

In the *Husty* case, *supra,* the officers had known Husty to be a bootlegger for a number of years before the arrest, having arrested him on two prior occasions, resulting in conviction in each instance. On the day of the arrest, the officers received reliable information that two loads of liquor in automobiles were parked in a particular place. The officers, believing the information and acting upon it, found one of the cars at the place indicated, unattended. Later Husty, Laurel,

and a third man entered the car. Husty had started it when he was stopped by the officers. Laurel and the third man fled. The latter escaped. Under these circumstances, it was held that the officers acted on probable cause.

A further review of the authorities would unduly protract this opinion. Suffice to say an examination of the cases relied on by respondent will indicate that, in many of them, the arresting officers were personally acquainted with the persons arrested and knew them to be law violators; in others, they had specific and direct information that the offenders would perform criminal acts at a certain time and place; in others, the officers actually observed the commission of the offense, and in still others, the search was made following a lawful arrest. But in the case at hand, the officers had no previous information concerning the appellant. He was a total stranger to them. Neither of the officers had personal knowledge whether the plane contained liquor or narcotics.

They claim they went to the airport because of information imparted to them that liquor and narcotics were being smuggled by airplane and landed at the airport, yet they nowhere say that they suspected appellant of transporting *narcotics*. Since they acquired neither personal nor actual knowledge of the contents of the plane prior to the search, either by the sense of smell or sight, and since they had received no previous information that *appellant* was *expected* to land his plane with *liquor*, then by what possible process could the officers determine in advance of the search that the plane contained *liquor* rather than *narcotics?* Obviously they could not.

The fact that Clark delayed making the search until after appellant had gained a position on the highway

where he could not see him making the search, is a circumstance worthy of note. Why did Clark delay? Was it to escape a rebuke at the hands of appellant in the event nothing should be discovered in the search?

Under all the attendant circumstances, the search was made not on probable cause, but on mere suspicion.

In the case of *Hernandez v. United States,* 17 Fed. (2d) 373, the court had under consideration the legality of a search without a warrant. Federal narcotic agents were watching a house at which it was believed narcotics had been sold. They saw the defendant coming from the rear of the house, accompanied by a woman who was a narcotic peddler, and saw them proceeding down the street looking around in different directions "in rather a suspicious way." They arrested both the defendant and the woman. They found no narcotics on the woman, but, on searching the defendant, they found morphine in his overcoat pocket. The evidence so seized was introduced in evidence, and raised the question whether there was probable cause for the arrest. The court said:

"The officers who made the arrest knew nothing whatever of the defendant or his prior conduct. The fact that he was seen coming from a suspected house in company with a suspected woman, and that he and the woman were walking down the street looking around in what the officers thought was a suspicious manner, whatever that may have meant, constituted all of the evidence of probable cause. It falls far short, we think, of presenting reasonable grounds of suspicion, supported by facts which would warrant a cautious man in believing that the defendant had committed a felony. At most, the circumstances were sufficient to create only a suspicion, and suspicious circumstances, it has been repeatedly held, do not constitute probable cause. It is true that the defendant was arrested in the commission of a felony, as was subsequently developed, but the officers were not apprised of that fact,

by their senses or otherwise, and they had no reasonable ground to believe it."

The judgment is reversed and the cause remanded, with direction to the trial court to sustain the motion to suppress the evidence.

BEALS, MAIN, MILLARD, HOLCOMB, and PARKER, JJ., concur.

TOLMAN, C. J., and FULLERTON, J., dissent.