[No. 30474. *En Banc.* November 5, 1948.]

THE CITY OF BREMERTON, *Respondent and Cross-appellant,*
v. CLYDE O. SMITH *et al., Appellants.*[1]

[1]Reported in 199 P. (2d) 95.

*Frederick B. Cohen* and *Jack Rowles*, for appellants.

*Oluf Johnsen* and *Merrill Wallace*, for respondent and cross-appellant.

*Richard S. Munter, H. E. T. Herman*, and *Cornelius C. Chavelle, amici curiae*.

MALLERY, C. J.—From a conviction in the municipal police court of Bremerton, the defendants appealed to the superior court of Kitsap county. Upon a trial *de novo*, they were convicted on counts I and IV of an amended complaint charging: (1) that they mutilated and injured slot machines belonging to the Moose Lodge; and (2) that they took, pilfered, and appropriated to their own use money of the United States of America taken from the slot machines belonging to the Moose Lodge.

The appellants assign as error the action of the trial court in (a) overruling the demurrer to an amended complaint; (b) denying motion for directed verdict and motion to dismiss; (c) denying motion made in arrest of judgment; (d) overruling motion to suppress evidence; (e) admitting exhibits A, B, C, D, and F; (f) refusing to admit certain tes-

timony; (g) in giving instructions Nos. 4, 6, and 15; and (h) refusing to give two instructions proposed by defendants.

After appellants appealed to the superior court, they demurred to the complaint upon which they were tried in the municipal court. The demurrer was sustained, whereupon the city attorney filed with the clerk of the superior court an amended complaint, charging appellants with the commission of misdemeanors in six counts. In the first three counts of the amended complaint, appellants were charged with mutilating and injuring slot machines belonging to the Moose Lodge, the Eagles Lodge, and the Bremerton City Club, in violation of ordinance No. 325, § 40, of the city of Bremerton. In the last three counts, appellants were charged with taking, pilfering, and appropriating to their own use money of the United States belonging to the above-named organizations, in violation of § 8 of the same ordinance. A demurrer to the amended complaint, based upon statutory grounds, was overruled.

The first argument advanced by appellants is that the city attorney could not, upon appeal to the superior court, amend his complaint by adding new counts. We are unable to find any error in the court's allowance of the motion to amend the complaint. Appeals from municipal or justice courts are tried *de novo* in the superior court. Rule of Practice 12 (2), 18 Wn. (2d) 40-a, allows, under certain conditions, the amendment of an information. There is no good reason to deny the right to amend the complaint, such as was presented to the court in this case. True, the rule mentions only informations. The evident purpose of the rule, however, was to allow amendments to all charges in a criminal case.

Appellants contend that slot machines are lotteries, are not property, and that it is not a criminal act to mutilate, deface, or injure them.

Though a possessor of a thing of value be unable to make good in court a legal right to possess it, still, one with no claim of right may not mutilate it or, by stealth, trick, force, or threats, take it from him. To hold otherwise would

frustrate that basic purpose of the law, which is to bring peace and security to society. It should not be decreed that such a possessor be relegated and invited to the use of force and violence to maintain his possession because of immunity granted to outlawry. No variety of larceny can be made consistent with the interests of an orderly society. See *State v. Schoonover*, 122 Wash. 562, 211 Pac. 756, and *State v. Donovan*, 108 Wash. 276, 183 Pac. 127.

The trial developed the facts that the Moose Lodge, the Eagles Lodge, and the Bremerton City Club maintained slot machines in their clubrooms. The appellants made the rounds of these clubs. Upon entering the clubrooms, the procedure followed was to buy scrip books for drinks and secure silver coins ostensibly with the purpose of playing the slot machines. Appellant Smith acted as a lookout, while the others played. Appellant Clyde Smith told Officer Carey that it took about five seconds to drill holes in the slot machines, and that they "beat" the machines in the clubrooms mentioned. The jack pots on some of the slot machines ran as high as fifty dollars. The exact method of manipulating the slot machines after the holes were bored was not explained in the record. Smith explained to the officer that he and his wife took one half of the winnings and Herschil and Miltred Blackwell took the other half, after all expenses were deducted.

After the appellants left the Moose clubroom, the attendant noticed metal shavings in the slot machine trays and thereupon discovered that small holes had been bored in the machines just above the jack pot receptacles. Information was then given to the police, which led up to the arrest here in question.

The most difficult question in the case hinges upon the legality of the arrest of the defendants. They were arrested without a warrant, and articles seized from them were introduced in evidence as exhibits in the case. If the arrest was illegal, then the articles revealed in the search incident to it should have been suppressed. On the other hand, if the arrest was legal, then the exhibits were properly admitted. The offense was not committed in the pres-

ence of the arresting officer, and hence, to be valid without a warrant, it must have been for a felony and upon sufficient information of a competent nature given to the officer to fall under the rule that he must have had probable cause to believe that a felony had been committed.

The question presented to us is not one of law, which is reasonably clear, but one of fact, that is: Do the facts in this case bring it under the rule permitting an arrest for a felony not committed in the presence of an arresting officer? The information possessed by the arresting officer may be summarized as follows: He recognized Mrs. Blackwell as one of the persons described in a circular received from the Aberdeen police department, in which she and the other defendants were described as expert pinball machine defrauders; she had been pointed out to him as one of the individuals who had taken "a large sum of money" from the slot machines located in the clubrooms of the Moose Lodge at Bremerton; he had found on the front seat of the car in which she had been riding, a canvas bag containing a large quantity of silver coins (subsequently ascertained to amount to more than two hundred dollars), a hand drill, and two shims, or "feelers," with hooks on the end. These articles were in plain view of anyone looking into the car. The weight of the bag containing more than two hundred dollars in silver coins apprised the arresting officer that its contents amounted to more than twenty-five dollars. (There was $266.55 in the bag when it was introduced in evidence, but the testimony showed that forty or fifty dollars of that amount had been taken from Mrs. Blackwell's purse and placed in the bag after the arrest, so that the money in the bag, when taken from the front seat of the car, must have amounted to more than two hundred dollars.)

The examination of Mrs. Blackwell's purse followed the arrest, and, in addition to the forty or fifty dollars in silver above referred to, the following articles were found therein: colored crayons, matches, a pen knife, and drills. These articles were significant because of the testimony that it was customary, after holes had been drilled in a slot ma-

chine, to insert matches in the holes and to color the ends of the matches with crayon of the same color as the machine.

■ We conclude that these facts bring the defendants within the rule, and that the arrest was lawful, that the search was incident thereto, and that therefore the exhibits were admissible.

The fact that the defendants were ultimately charged with and convicted of pilfering instead of grand larceny is, of course, entirely beside the point; the material issue is whether the arresting officer had probable cause to believe, at the time the arrest was made, that the defendants were guilty of a felony.

The exercise of discretion on the part of the city attorney in filing a complaint in the municipal police court, which has no jurisdiction over felonies, is without significance, since it does not relate back and convert the arrest for a felony into one for a misdemeanor.

■ Appellants urge that the trial court erred in refusing them the privilege of demonstrating to the jury the manner in which slot machines could be made to pay without the use of any method other than the manipulation of the lever by which the machines are operated.

"The admissibility of experiments, illustrations, and other demonstrative evidence before a jury, throwing light upon the manner in which a crime was committed, rests in the discretion of the trial court." *State v. Richardson,* 197 Wash. 157, 84 P. (2d) 699.

We are of the opinion that the trial court properly exercised its discretion in refusing a demonstration. The demonstration, if made, could not have tended to in any manner disprove the evidence introduced by the city.

■ Complaint is made about instructions given. Those instructions are not included in appellants' brief and cannot be considered.

Appellants also predicate error upon the refusal of the trial court to give two requested instructions. We have examined those instructions and find that the court was entirely correct in refusing to give them, the reason being

that they did not state the law as we have determined it to be.

Passing now to the city's cross-appeal, we shall assume without deciding that the city has a right to appeal. The court granted a motion in arrest of judgment by authority of Rule of Practice 12(4), 18 Wn. (2d) 40-a. It will be remembered that counts II, III, V, and VI of the complaint charge offenses committed in the Eagles Lodge and in the Bremerton City Club, and that the court dismissed the charges contained in these counts. A study of the evidence convinces us that the ruling of the trial court was correct. The evidence submitted to the jury was insufficient to justify the verdict of guilty in so far as the last-mentioned charges were concerned.

The judgment is affirmed.

BEALS, STEINERT, JEFFERS, and HILL, JJ., concur.

SIMPSON, J. (dissenting)—This case was first assigned to me. I wrote to reverse. A dissent was written and received a majority. The case was then assigned to the writer of the present majority opinion. I shall again state the facts gleaned from the records in this case as contained in my opinion:

The Moose Lodge, the Eagles Lodge, and the Bremerton City Club maintained devices known as slot machines. These machines, sixty in number, are located in the organizations' respective clubrooms. The machines are so constructed that it is impossible to win from them except by chance.

Appellants visited the Eagles, Moose, and City Club rooms in which the slot machines were located. Upon entering the clubrooms, the usual procedure was to buy scrip books and drinks, and silver with which to play the machines. Appellant Smith acted as a lookout while the other appellants played. At times, they won jack pots. The jack pot on some of the machines paid as high as fifty dollars. After appellants left the Moose clubroom, the attendant noticed metal shavings in the machine trays. He also noticed that small

holes had been bored in the machines just above the jack pot receptacles.

Appellant Clyde Smith explained to Police Officer Vern Carey that he and his wife took half the earnings, and Herschil and Miltred Blackwell received the other half of the winnings, after all expenses were paid. Smith told the officer it took about five seconds to drill the holes in the slot machines, and that the appellants beat the machines in the Moose Lodge, Eagles Lodge, and in the City Club. The exact method used by appellants in obtaining money from the slot machines by means of the drilled holes, was not explained.

The first argument advanced by appellants is that the city attorney could not on appeal to the superior court amend his complaint by adding new counts. I am unable to find any error in the court's allowance of the motion to amend the complaint. Appeals from municipal or justice courts are tried *de novo* in the superior court. Rule of Practice 12(2), 18 Wn. (2d) 40-a, allows, under certain conditions, the amendment of an information. There is no good reason to deny the right to amend the complaint such as was presented to the court in this case. True, the rule mentions only informations. The evident purpose of the rule, however, was to allow amendments to all charges in a criminal case.

The next contention made by appellants relates to the denial of their motion to suppress certain evidence. The motion to suppress was timely made prior to the trial in the city court, and prior to the trial in the superior court. The motion was based on the ground that appellants' arrest was without warrant, and that certain articles seized by the city police officers were taken from appellants' automobile without their consent, and without a search warrant. The articles seized, and afterwards admitted in evidence, were: a small drill, two wires about eight inches in length, a canvas bag containing money, and Mrs. Blackwell's purse (taken from her person) containing some wooden matches, colored crayons, a penknife, and drills. At the beginning of the trial

in the superior court, the motion to suppress evidence was denied.

The facts leading up to and surrounding the arrest, search, and seizure, are: About 6:30 p. m., May 23, 1947, appellants were seated in their automobile on Fourth street in the city of Bremerton, at which time Sergeant Matthews of the Bremerton police department approached them and requested that they accompany him to the police station. Appellants then went with the officer to the police station, where they remained. Immediately afterward, the sergeant returned to the automobile and took from the front seat thereof the articles mentioned above, except the purse belonging to Mrs. Blackwell and its contents.

The city's opposition to the motion to suppress the evidence is contained in two affidavits of members of the Bremerton police department. One affidavit, signed by Officer Robert Bramlett, stated that, May 23, 1947, at about ten a. m., he received by letter from the police department of Aberdeen, four photographs identifying Otie Elizabeth Smith, Clyde Oscar Smith, Herschil Lowranzy Blackwell, and Miltred Ruth Blackwell, and that all of the individuals were reported to be expert pinball machine operators. The affidavit showed that the officer then placed on the bulletin board the photographs, with the following information: "EXPERT PINBALL MACHINE DEFRAUDERS—Reported by Aberdeen Police Department 5-23-47—Descriptions on reverse side of pictures."

The affidavit of Richard A. Matthews of the Bremerton police force, showed that: About 6:40 p. m., May 23, 1947, Fred D. Taylor entered the city hall and complained that four individuals, whose names were unknown, entered the clubrooms of the Moose Lodge, took therefrom, "A LARGE AMOUNT OF MONEY, THE EXACT AMOUNT OF WHICH WAS UNKNOWN, FROM SLOT MACHINES." Later, Mr. Taylor notified the sergeant that the four individuals were then entering an automobile on a Bremerton street near the police station. During the day, Officer Matthews had noticed the photographs posted on the bulletin board by Officer Bram-

lett. Officer Matthews required appellants to enter the police headquarters. Appellants complied with the request, and Miltred Blackwell then asked the officer to get for her from the car a large amount of money in a canvas bag on the front seat. He did as requested and returned with the money bag, a hand drill, and two wire shims or feelers with hooks on the end. The officer did not have a search warrant to search appellants' car, their persons, nor appellant Miltred Blackwell's purse.

An affidavit signed by Mrs. Blackwell stated that she had never requested Officer Matthews to secure anything from the automobile; that, after appellants were taken into the police station, Officer Matthews left and "came back a few minutes later carrying certain articles of personal property which had been on the front seat of the automobile"; that, shortly thereafter, the officers again departed from the police station and returned with other articles of personal property, all of which had been locked in either the glove compartment or the back of the car. Her affidavit also shows that the officers took from her purse, which she had in her possession, a large sum of money. There is no showing by appellants that any of the articles introduced in evidence, except the purse taken from Mrs. Blackwell, and its contents, were in the glove compartment or in the back portion of the car. I conclude, therefore, that the articles introduced in evidence, except the contents of Mrs. Blackwell's purse, were on the front seat of the automobile and in plain view of anyone looking into the car. It is my conclusion that all of the seized articles found on the seat of the automobile were admissible in evidence.

The constitutional prohibition against search and seizure does not apply in cases in which articles seized were secured as a result of a search, but were in plain view of the officers. *State v. Miller,* 121 Wash. 153, 209 Pac. 9; *State v. Duncan,* 124 Wash. 372, 214 Pac. 838; *State v. Dutcher,* 141 Wash. 627, 251 Pac. 879; *State v. Parent,* 156 Wash. 604, 287 Pac. 662; and, 47 Am. Jur. 516, Searches and Seizures, § 20.

A different situation is presented by the introduction of the articles obtained by searching the purse in the posses-

sion of Mrs. Blackwell. The motion to suppress the evidence, and the evidence produced at the trial on behalf of the state over objection, showed that Officer Matthews took the purse from Mrs. Blackwell while she was in the police station, searched it, and took therefrom the colored crayons, wooden matches, the penknife, and drills that were introduced in evidence. The majority attempts to justify the introduction of this evidence on the ground that it was obtained as an incident to the arrest. The only basis upon which the majority could justify the search of Mrs. Blackwell's purse as an incident to the arrest, is that the officer had a good and sufficient reason to believe that Mrs. Blackwell had committed a felony.

The majority opinion states: "The question presented to us is not one of law, which is reasonably clear, but one of fact." If this opinion is followed, hereafter this court will have two sets of reports—one dealing with questions of fact, the other with questions of law.

The majority opinion does not cite any sustaining authority for its holding—this for the simple reason that there is no sustaining authority either in this, or any other court of the Union. On the other hand, the courts, including this one, have time and again held contrary to the holding of the majority opinion.

The majority has lost sight of its recent utterances in the case of *State v. Miles*, 29 Wn. (2d) 921, 190 P. (2d) 740, in which it was held:

"The rights of individuals as guaranteed by our constitution, are not to be lightly considered. The framers of our constitutions, Federal and state, realized that laws affecting the liberty of men must be safeguarded, since the wisdom of the ages has taught that unrestrained official conduct in respect to depriving men of their liberties would soon amount to a total loss of those liberties. Where procedure relating to arrest and search is provided, it must be strictly followed.

"This conclusion is fortified by the following excerpts from *Gouled v. United States*, 255 U. S. 298, 65 L. Ed. 647, 41 S. Ct. 261:

" 'It would not be possible to add to the emphasis with

which the framers of our Constitution and this court (in *Boyd v. United States,* 116 U. S. 616, in *Weeks v. United States,* 232 U. S. 383, and in *Silverthorne Lumber Co. v. United States,* 251 U. S. 385) have declared the importance to political liberty and to the welfare of our country of the due observance of the rights guaranteed under the Constitution by these two Amendments. The effect of the decisions cited is: that such rights are declared to be indispensable to the "full enjoyment of personal security, personal liberty and private property"; that they are to be regarded as of the very essence of constitutional liberty; and that the guaranty of them is as important and as imperative as are the guaranties of the other fundamental rights of the individual citizen,—the right, to trial by jury, to the writ of *habeas corpus* and to due process of law. It has been repeatedly decided that these Amendments should receive a liberal construction, so as to prevent stealthy encroachment upon or "gradual depreciation" of the rights secured by them, by imperceptible practice of courts or by well-intentioned but mistakenly over-zealous executive officers.

" ' . . . It is plain that the trial court acted upon the rule, widely adopted, that courts in criminal trials will not pause to determine how the possession of evidence tendered has been obtained. While this is a rule of great practical importance, yet, after all, it is only a rule of procedure, and therefore it is not to be applied as a hard and fast formula to every case, regardless of its special circumstances. We think rather that it is a rule to be used to secure the ends of justice under the circumstances presented by each case, and where, in the progress of a trial, it becomes probable that there has been an unconstitutional seizure of papers, it is the duty of the trial court to entertain an objection to their admission or a motion for their exclusion and to consider and decide the question as then presented, even where a motion to return the papers may have been denied before trial. A rule of practice must not be allowed for any technical reason to prevail over a constitutional right.'

"It is beneath the dignity of the state of Washington, and against public policy, for the state to use for its own profit any evidence that has been unlawfully obtained. *State v. Buckley,* 145 Wash. 87, 258 Pac. 1030, and *State v. Knudsen,* 154 Wash. 87, 280 Pac. 922."

The danger to the liberties of the people of this state, if the majority rule prevails, is real and not imaginary. It

has been a fundamental principle of Anglo-American law from the time of Magna Charta to the present day that a citizen may not be deprived of his liberty except by due process of law.

We should follow the direction contained in our state constitution, Art. I, § 32:

"A frequent recurrence to fundamental principles is essential to the security of individual rights, and the perpetuity of free government."

A fundamental principle of American government, without which there is no liberty, is contained in the following quotations:

"The Constitution of the United States is the supreme law of the land." Art. I, § 2, Const. of the state of Washington.

"No person shall be disturbed in his private affairs, or his home invaded, without authority of law." Art. I, § 7, Const. of the state of Washington.

"No person shall be compelled in any criminal case to give evidence against himself, or be twice put in jeopardy for the same offense." Art. I, § 9, Const. of the state of Washington.

"The right of the people to be secure in their persons, houses, PAPERS, and EFFECTS, against unreasonable searches and seizures, shall not be violated; and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the PLACE TO BE SEARCHED, and the PERSONS or THINGS TO BE SEIZED." Amendment 4, Const. of the United States. (Emphasis mine.)

". . . nor shall [any person] be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property without due process of law; nor shall private property be taken for public use without just compensation." Amendment 5, Const. of the United States.

"These guaranties are in substance the same in both [Federal and state constitutions], making the law upon the subject as expounded by the supreme court of the United States . . . a proper aid,"
in questions such as presented here. *State v. Gibbons,* 118 Wash. 171, 203 Pac. 390.

Following, I quote from cases in this state and other jurisdictions, which prove conclusively that the search of Mrs. Blackwell's purse violated her constitutional rights

as they have been guaranteed to her by the constitutional provisions I have quoted. These authorities prove that the rules relative to the due process of law were not adhered to in the majority opinion.

In *Grau v. United States*, 287 U. S. 124, 77 L. Ed. 212, 53 S. Ct. 38, we find the following statement made by Mr. Justice Roberts, who wrote the opinion:

*"A search warrant may issue only upon evidence which would be competent in the trial of the offense before a jury (Giles v. United States,* [C.C.A.] 284 Fed. 208; *Wagner v. United States,* [C.C.A.] 8 F. (2d) 581); and would lead a man of prudence and caution to believe that the offense has been committed. *Steele v. United States*, 267 U. S. 498, 504 [69 L. Ed. 757, 45 S. Ct. 414]." (Italics mine.)

In following the *Grau* case, the court in *Reeve v. Howe*, 33 F. Supp. 619, stated:

"Was the search and seizure invalid? That is to say, was the supporting warrant itself supported by sworn facts competent to be submitted to a jury, as reasonably affording probable cause for believing that seditious or subversive matter was to be found at the headquarters of the Communist Party at 250 South Broad Street? This is the standard by which the validity of the search and seizure is to be tested. *Grau v. United States*, 287 U. S. 124-128, 53 S. Ct. 38, 77 L. Ed. 212."

We find the following statement in *United States v. Novero*, 58 F. Supp. 275:

"Evidence upon which an officer may base probable cause for search without a warrant must be sufficient to obtain a search warrant—and evidence which would be competent in the trial of the offense before a jury."

In *State v. Vennir*, 159 Wash. 58, 291 Pac. 1098, we set out the facts, and then quoted with approval from *Hernandez v. United States*, 17 F. (2d) 373, as follows:

" 'The officers who made the arrest knew nothing whatever of the defendant or his prior conduct. The fact that he was seen coming from a suspected house in company with a suspected woman, and that he and the woman were walking down the street looking around in what the officers thought

was a suspicious manner, whatever that may have meant, constituted all of the evidence of probable cause. It falls far short, we think, of presenting reasonable grounds of suspicion, supported by facts which would warrant a cautious man in believing that the defendant had committed a felony. At most, the circumstances were sufficient to create only a suspicion, and *suspicious circumstances,* it has been repeatedly held, *do not constitute probable cause.* It is true that the defendant was arrested in the commission of a felony, as was subsequently developed, but the officers were not apprised of that fact, by their senses or otherwise, and they had no reasonable ground to believe it.' " (Italics mine.)

In *State v. Kinnear,* 162 Wash. 214, 298 Pac. 449, 74 A. L. R. 1400, this court cited with approval *Brown v. United States,* 4 F. (2d) 246, in which we find the following statement:

" ' "If *the seizure is merely based upon a suspicion, and the facts are not sufficient to justify an arrest, the subsequent discovery by an examination of the evidence, secured by the seizure, that the suspicion was in fact well founded, is not sufficient to make what was unlawful at its commencement a lawful search.* . . . The proper test, supported by the great weight of authority, by which this case should be decided, is: Were the circumstances presented to the officers through the testimony of their senses sufficient to justify them in a good-faith belief that plaintiff in error was in their presence transporting liquor in violation of law, or that he had in their presence liquor in his possession in violation of law? In other words, was there probable cause for them to so believe, or were the facts sufficient to give rise merely to a suspicion thereof? If the former the arrest was legal and the evidence secured by it admissible. *If the latter, the arrest was illegal, and the evidence obtained not admissible."* Garske v. United States, 1 F. (2d) 620, 625.

" 'If, instead of arresting the plaintiff in error, the officer had presented all of the facts within his knowledge and all the information at hand to a magistrate, no magistrate would issue a warrant of arrest for the plaintiff in error; no magistrate would hold the plaintiff in error to answer for a crime before another tribunal; no grand jury would indict; no court would submit the case to a jury; and, if the officer were sued for false imprisonment, no court would instruct that the arrest was justified, assuming all the foregoing testimony to be true. If we are correct in these conclusions, and we see no escape from them, the arrest was without au-

thority of law, and the property wrongfully seized was not admissible in evidence.'" (Italics mine.)

This court followed the above rule and explained it further in the case of *Ladd v. Miles,* 171 Wash. 44, 17 P. (2d) 875, where it is said:

"Did the deputy sheriff, acting under the directions of his superior, have. and disclose to the magistrate an actual knowledge of sufficient facts to constitute probable cause? That all the facts going to show probable cause need not be stated in the affidavit or complaint, seems to be established by our own cases of [citing cases]; but none of those cases in any way negatives the rule of the supreme court of the United States, recently announced [*Grau v. United States, supra*], to the effect that, by evidence competent in a trial before a jury, the probable cause must be so far established as would lead a man of prudence and caution to believe that the offense had been committed. . . .

"We think it must be here held that the sheriff and his deputies had no actual knowledge of any offense having been committed, could not have given competent testimony such as would justify the issuance of the warrant (and of course did not), and that they acted wholly on hearsay and incompetent evidence, most of which was doubly hearsay, which was the only sort of evidence disclosed to the justice, as they very well knew; that, therefore, they received and acted under a warrant known by them to be improperly issued, which was therefore no protection to them. . . .

"*The rule of the supreme court of the United States requiring probable cause to be shown by evidence competent in a trial before a jury seems to be a just one.* Our own case of *State v. Kinnear,* 162 Wash. 214, 298 Pac. 449, leans strongly in that direction, and in addition to the cases already cited, *Wallace v. State,* 199 Ind. 317, 157 N. E. 657, and *People v. Sovetsky,* 343 Ill. 583, 175 N. E. 844, are among the recent holdings which support our present views." (Italics mine.)

Accord: *Sgro v. United States,* 287 U. S. 206, 77 L. Ed. 260, 53 S. Ct. 138, 85 A. L. R. 108; *United States v. Allen,* 16 F. (2d) 320; and, *Poldo v. United States,* 55 F. (2d) 866.

A case bearing directly upon the question presented here is that of *United States v. Clark,* 29 F. Supp. 138. In that case, it appears that a Federal narcotic agent, who had ob-

served defendant drive in to a station, approached the automobile in which she was seated, placed her under arrest, although he had no warrant of arrest, searched defendant's person, although he had no search warrant, and found concealed in her clothing seventy grains of heroin not in the original stamped package, which he seized. Immediately before the arrest, the defendant's companion, who was an informer known to the agent and officers with him to be reliable, indicated to the agent by signal in accordance with a prearranged code that the defendant actually had narcotics in her possession. The court, in passing upon the motion to suppress the evidence, stated:

"The question is: Is the positive statement by a citizen of good reputation to an officer that another citizen has committed a felony a reasonable ground which will justify an arrest without a warrant."

Answering its own question, the court made the following holding:

"It seems to us that the Fourth Amendment to the Constitution, U. S. C. A., is whittled away to nothingness if it is held that a citizen may be arrested and searched without a warrant of arrest or a search warrant if only it is shown that some reliable informer has said the citizen has committed or is committing a felony, without any showing whatever (and there was none here) that the informer's information was itself more than mere guess-work and speculation.

"Learned counsel for the Government suggests that even if the arrest of the defendant was unlawful, still the search of the defendant's person was lawful. We are unable to agree. 1. The forcible seizure and search of another's person is an arrest. 2. To justify either the arrest or the search the officer must have had reasonable grounds to believe that a felony had been committed by the defendant. In this case such grounds have not been shown.

"We must confess that we now draw back a little when we hear asserted a claim of constitutional right in a criminal case. Almost always, as in this instance, it is advanced to shield an individual who is guilty from the justice of the law he has flouted. The only satisfaction we can derive from maintaining the constitutional rights of such a person arises from the knowledge that the obligation of the judicial oath requires it and from the certainty that only so may the pro-

tection of the Constitution be preserved against the day when innocent men will need it as a defense from governmental tyranny.

"The motion to suppress the evidence is sustained."

The case of *United States v. Di Re*, 332 U. S. 581, 92 L. Ed. 218, 68 S. Ct. 222, is one that has a definite bearing upon the arrest, search, and conviction of appellants. The facts in that case show that one Buttitta planned to sell counterfeit gasoline ration coupons to an informer at a certain time. At that time, an OPA officer and a New York state police officer saw Buttitta's car stop at a street corner. Buttitta was driving. Di Re was seated beside him, and Reed, the informer, was in the back seat with two coupons in his hand. Reed stated that he secured the coupons from Buttitta. The officers felt the clothing of all three men to see if they had weapons, and then took them to the police station. Officers then told Di Re to lay his possessions on the table. He produced two gasoline coupons, which he said he had found. Shortly afterwards, he was searched, and one hundred counterfeit coupons were found between his shirt and underwear.

The circuit court of appeals reversed Di Re's conviction in the district court on the ground that the coupons were obtained during an unlawful search; that Di Re's presence in the car did not constitute probable cause for believing that he was a party to an illicit coupon transfer between Buttitta and Reed, and, therefore, there was no probable cause for his arrest and search.

On appeal to the United States supreme court, that court made the following holding:

"The Government now concedes that the only person who committed a possible misdemeanor in the open presence of the officer was Reed, the Government informer who was found visibly possessing the coupons. Of course, as to Buttitta they had previous information that he was to sell such coupons to Reed, and Reed gave information that he had done so. But the officer had no such information as to Di Re. All they had was his presence and if his presence was not enough to make a case for arrest for a misdemeanor, it is hard to see how it was enough for the felony of violating § 28 of the Criminal Code. . . .

"The Government's defense of the arrest relies most heavily on the conspiracy ground. In view of Reed's character as an informer, it is questionable whether a conspiracy is shown. But if the presence of Di Re in the car did not authorize an inference of participation in the Buttitta-Reed sale, it fails to support the inference of any felony at all.

"There is no evidence that it is a fact or that the officers had any information indicating that Di Re was in the car when Reed obtained ration coupons from Buttitta, and none that he heard or took part in any conversation on the subject. Reed, the informer, certainly knew it if any part of his transaction was in Di Re's presence. . . .

"An inference of participation in conspiracy does not seem to be sustained by the facts peculiar to this case. The argument that one who 'accompanies a criminal to a crime rendezvous' cannot be assumed to be a bystander, forceful enough in some circumstances, is farfetched when the meeting is not secretive or in a suspicious hide-out but in broad daylight, in plain sight of passers-by, in a public street of a large city, and where the alleged substantive crime is one which does not necessarily involve any act visibly criminal. If Di Re had witnessed the passing of papers from hand to hand, it would not follow that he knew they were ration coupons, and if he saw that they were ration coupons, it would not follow that he would know them to be counterfeit. Indeed it appeared at the trial to require an expert to establish that fact. Presumptions of guilt are not lightly to be indulged from mere meetings. . . .

"We meet in this case, as in many, the appeal to necessity. It is said that if such arrests and searches cannot be made, law enforcement will be more difficult and uncertain. But the forefathers, after consulting the lessons of history, designated our Constitution to place obstacles in the way of a too permeating police surveillance, which they seemed to think was a greater danger to a free people than the escape of some criminals from punishment. Taking the law as it has been given to us, this arrest and search were beyond the lawful authority of those who executed them."

Another case which bears upon the question of search and seizure is that of *Johnson v. United States*, 333 U. S. 10, 92 L. Ed. 323, 68 S. Ct. 367. The facts in that case, which related to search and seizure, were: An officer named Bel-

land, who had had considerable experience on a narcotic detail, was informed that the smoking of opium was in progress in a certain hotel. Shortly after receiving the information, the officer proceeded to investigate the information given him. He arrived at the hotel shortly before nine p. m., taking three other officers with him, and two of of the officers went to the second floor, where they detected a strong odor of burning opium. The odor was traced to room No. 1, from which a strong current of opium fumes came from cracks in the panels of the door, and from cracks around it. The officer, Belland, rapped, stated his name, and requested admittance. Subsequently, the door of the room was opened by a woman, who denied that she had been smoking opium, or had any of the narcotic in her possession. However, a complete opium smoking outfit, with some of the drug, was found under the bed covers, and the pipe was still warm. The officers found the opium and smoking outfit by searching the room without a search warrant. In passing upon the question presented, the United States supreme court said:

"The Government contends, however, that this search without warrant must be held valid because incident to an arrest. This alleged ground of validity requires examination of the facts to determine whether the arrest itself was lawful. Since it was without warrant, it could be valid only if for a crime committed in the presence of the arresting officer or for a felony of which he had reasonable cause to believe defendant guilty.

"The Government, in effect, concedes that the arresting officer did not have probable cause to arrest petitioner until he had entered her room and found her to be the sole occupant. It points out specifically, referring to the time just before entry, 'For at that time the agents did not know whether there was one or several persons in the room. It was reasonable to believe that the room might have been an opium smoking den.' And it says, '. . . that when the agents were admitted into the room and found only petitioner present they had a reasonable basis for believing that she had been smoking opium and thus illicitly possessed the narcotic.' Thus the Government quite properly stakes the right to arrest, not on the informer's tip and the smell the officers recognized before entry, but on the knowl-

edge that she was alone in the room, gained only after, and wholly by reason of, their entry of her home. It was therefore their observations inside of her quarters, after they had obtained admission under color of their police authority, on which they made the arrest.

*"Thus the Government is obliged to justify the arrest by the search and at the same time to justify the search by the arrest. This will not do.* An officer gaining access to private living quarters under color of his office and of the law which he personifies must then have some valid basis in law for the intrusion. *Any other rule would undermine 'the right of the people to be secure in their persons, houses, papers, and effects,' and would obliterate one of the most fundamental distinctions between our form of government, where officers are under the law, and the police-state where they are the law."* (Italics mine.)

The most recent expression of the position taken by the United States supreme court on the question of illegal search and seizure, is found in *Trupiano v. United States,* 334 U. S. 699, 92 L. Ed. 1198, 68 S. Ct. 1229. The facts in that case were much more favorable to the government than the facts in this case are to the city of Bremerton. The case is so directly in point that I set out the essential facts and the holding of the court:

Certain individuals, who were arrested and tried, had rented a farm in New Jersey, where they built and operated an illegal still. The owner of the farm informed the alcohol tax unit of the bureau of internal revenue about the activities of his tenants, and the bureau sent an agent to the farm for the purpose of working there and receiving information. The agent thereafter kept the bureau informed at all times about the activities of the men who were running the still, and even used a two-way portable radio set to transfer information about the distillery. June 3, 1946, the agent notified his superiors over the radio that the still operators were awaiting the arrival of a load of sugar, and further, that the alcohol was to be taken from the farm when the sugar truck arrived. Thereafter, three Federal agents drove to within a short distance of the farm, where they were met by the owner of the rented premises,

in whose car the agents were transported to the still. They arrived at the location of the still about 1:45 p. m.

They testified that the odor of fermenting mash and the sound of a gasoline motor were noticeable as they reached the farm premises. Further, that the odor became stronger and the noise louder as they alighted and approached the building containing the still. They looked through an open door into a dimly lighted interior, where they noticed a still column, a boiler, and a gasoline pump in operation. They also saw one of the defendants bending down near the pump. The agents entered the building and placed the pump attendant under arrest, and then "seized the illegal distillery."

After the arrest and seizure, an agent found a large number of five-gallon cans which contained alcohol; also some vats which contained fermenting mash. Other investigation was made, and other properties seized. The officers did not have a warrant of arrest, nor a search warrant.

The supreme court of the United States held that the arrest of the man who was attending the pump was valid. The court stated:

"We sustain the Government's contention that the arrest of Antoniole was valid. The federal agents had more than adequate cause, based upon the information supplied by Nilsen, to suspect that Antoniole was engaged in felonious activities on the farm premises. Acting on that suspicion, the agents went to the farm and entered onto the premises with the consent of Kell, the owner. There Antoniole was seen through an open doorway by one of the agents to be operating an illegal still, an act felonious in nature. His arrest was therefore valid on the theory that he was committing a felony in the discernible presence of an agent of the Alcohol Tax Unit, a peace officer of the United States. The absence of a warrant of arrest, even though there was sufficient time to obtain one, does not destroy the validity of an arrest under these circumstances. Warrants of arrest are designed to meet the dangers of unlimited and unreasonable arrests of persons who are not at the moment committing any crime. Those dangers, obviously, are not present where a felony plainly occurs before the eyes of an officer of the law at a place where he is

lawfully present. Common sense then dictates that an arrest in that situation is valid despite the failure to obtain a warrant of arrest.

"But we cannot agree that the seizure of the contraband property was made in conformity with the requirements of the Fourth Amendment. It is a cardinal rule that, in seizing goods and articles, law enforcement agents must secure and use search warrants wherever reasonably practicable. *Carroll v. United States, supra,* 156; *Go-Bart Co. v. United States, supra,* 358; *Taylor v. United States,* 286 U. S. 1, 6; *Johnson v. United States,* 333 U. S. 10, 14-15. This rule rests upon the desirability of having magistrates rather than police officers determine when searches and seizures are permissible and what limitations should be placed upon such activities. *United States v. Lefkowitz, supra,* 464. In their understandable zeal to ferret out crime and in the excitement of the capture of a suspected person, officers are less likely to possess the detachment and neutrality with which the constitutional rights of the suspect must be viewed. To provide the necessary security against unreasonable intrusions upon the private lives of individuals, the framers of the Fourth Amendment required adherence to judicial processes wherever possible. And subsequent history has confirmed the wisdom of that requirement.

"The facts of this case do not measure up to the foregoing standard. The agents of the Alcohol Tax Unit knew every detail of the construction and operation of the illegal distillery long before the raid was made. One of them was assigned to work on the farm along with the illicit operators, making it possible for him to secure and report the minutest facts. In cooperation with the farm owner, who served as an informer, this agent was in a position to supply information which could easily have formed the basis for a detailed and effective search warrant."

The majority seeks to justify the search of appellant Miltred Blackwell by what the officers subsequently learned. This holding is in direct violation of every rule relating to search and seizure.

"We have had frequent occasion to point out that a search is not to be made legal by what it turns up. In law it is good or bad when it starts and does not change character from its success." *United States v. Di Re,* 332 U. S. 581, 68 S. Ct. 222.

The majority decided this case upon evidence acquired after the search and seizure was made. The appellants were entitled to have their motions to suppress decided upon the facts presented by the motions to suppress and the affidavits supporting those motions. To decide a motion to suppress improperly secured evidence, upon the facts ascertained during the trial, does not afford the appellants the protection afforded them by our state and national constitutions.

Another fatal defect in the majority opinion is that it is based upon invalid or insufficient information which the officers had at the time the officers searched Mrs. Blackwell's purse. Prior to the writing of the majority opinion, the rule in every court in the United States was to the effect that the search could not be justified, or a search warrant issued, except upon evidence which would be competent in the trial of an offense before the jury. *Steele v. United States*, 267 U. S. 498, 69 L. Ed. 757, 45 S. Ct. 414; *Grau v. United States*, 287 U. S. 124, 77 L. Ed. 212, 53 S. Ct. 38; *Giles v. United States*, 284 Fed. 208; *Garske v. United States*, 1 F. (2d) 620; *Brown v. United States*, 4 F. (2d) 246; *Wagner v. United States*, 8 F. (2d) 581; *Hernandez v. United States*, 17 F. (2d) 373; *United States v. Clark*, 29 F. Supp. 138; *Reeve v. Howe*, 33 F. Supp. 619; *United States v. Novero*, 58 F. Supp. 275; *State v. Vennir*, 159 Wash. 58, 291 Pac. 1098; *State v. Kinnear*, 162 Wash. 214, 298 Pac. 449; and *Ladd v. Miles*, 171 Wash. 44, 17 P. (2d) 875.

Was the information contained in the affidavits of that character which could be admitted in the trial of the persons charged with the crime? The statement that appellants had taken a large amount of money from the Moose Lodge gave no information that money had been stolen or in any way misappropriated. The statement did not contain any information that appellants had committed a crime, much less that they had committed a felony which would authorize an arrest without a warrant. It is no crime to take a large amount of money from any place at any time. Though the gambling device, known as a slot machine, robs its patrons, it at odd times pays, for an obvious purpose,

those victims substantial sums. To take a large amount of money from a place maintaining gambling machines, certainly would not amount to a felony if the large amount of money was won by playing the machines. In other words, to state that a person took a large amount of money from a gambling place would not be evidence admissible to prove the commission of a felony. The information would not have been sufficient, even had the informer told the officers that the appellants had committed a felony. *United States v. Clark*, 29 F. Supp. 138.

If, instead of searching Mrs. Blackwell's purse, the officer had presented all the facts within his knowledge (and those supposed facts *were all hearsay*), and all the information at hand, to a magistrate, no magistrate would issue a warrant of arrest for the appellants; no magistrate would hold the appellants to answer for a crime before another tribunal; no grand jury would indict; no prosecuting attorney would file an information; no court would submit the case to a jury; and, if the officer were sued for false imprisonment, no court would instruct that the arrest was justified.

The information contained in the notice placed on the police bulletin board did not indicate that any felony had been committed. At the most, that hearsay information indicated the commission of a misdemeanor. That, of course, would not give the officers the right to arrest without a warrant.

MILLARD, ROBINSON, and SCHWELLENBACH, JJ., concur with SIMPSON, J.